IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**CAROLYN KOLBE,**                                    Case No. 3:17 CV 809

      Plaintiff,

      v.                                              Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                   MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Carolyn Kolbe ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 18). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in January 2014, alleging a disability onset date of December 20, 2010. (Tr. 242-43). Plaintiff later amended her alleged onset date to September 14, 2012. *See* Tr. 15, 45.[1] Her claims were denied initially and upon reconsideration. (Tr. 136, 144). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 151). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on September 2,

---

[1] Plaintiff previously applied for DIB on December 28, 2010, alleging an onset date of December 22, 2010. (Tr. 15). That claim was denied (finding Plaintiff not disabled through September 13, 2012), and Plaintiff undertook an unsuccessful appeal to the United States District Court. *See* Tr. 15, 86, 106.

2015. (Tr. 39-85). On November 3, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-31). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on April 14, 2017. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in May 1968, making her 45 years old on her date last insured, and 47 at the time of the ALJ's decision. *See* Tr. 242. She alleged disability based on cervical and lumbar degenerative disc disease, cervical lordosis, depression, facet arthrosis, migraines, fibromyalgia, myofascial syndrome, and lumbar neuritis. (Tr. 272). She previously worked as a debt collector, customer service representative, and hair stylist. (Tr. 273). Plaintiff lived with her husband and two adult children during the relevant time period. (Tr. 47).

Plaintiff testified that since the prior ALJ's determination, her migraines, fatigue, and drowsiness had all increased. (Tr. 51). Plaintiff took Morphine and Percocet for migraines, which were triggered by food, weather, and activities. (Tr. 52).The medications made her ill, so she weaned off of them to try something different. (Tr. 53, 55). Plaintiff had approximately five or six "major" migraines per month. (Tr. 59).

Plaintiff had weakness with lifting, and would often drop things. (Tr. 54). She was unsure of the cause of the weakness, but thought it might be her medications. *Id.*

Plaintiff testified that a typical day involved getting up, doing some chores, taking medications (which made her drowsy), and napping during the day. (Tr. 55). Plaintiff napped every afternoon for two to four hours. (Tr. 67-68).

Plaintiff estimated she could sit or stand for fifteen to twenty minutes before needing to change positions. (Tr. 67). She thought pain and her tiredness/drowsiness would prevent her from being able to work an eight-hour day, even if permitted to alternate sitting and standing. (Tr. 67). She estimated she could lift ten pounds, but not repeatedly. (Tr. 71). She had difficulty reaching overhead, bending over, and she needed a railing on stairs. (Tr. 72-73). She had some difficulty with her hands due to carpal tunnel. (Tr. 73).

Plaintiff liked to swim, fish, read, and take walks in the park. (Tr. 56-57). She would "try to get out . . . a couple times a month". (Tr. 57). She fished from the shore for 30 minutes to an hour. (Tr. 74). She drove once or twice per week, and was able to grocery shop and do laundry. (Tr. 75). Her family carried groceries into the house and lifted laundry baskets. *Id.*

Plaintiff also had back and neck pain. (Tr. 61-62). She took a muscle relaxer, saw a chiropractor, a physical therapist, a pain management physician, and underwent injections in her neck every two to three months. (Tr. 63-65). The injections did not work. (Tr. 63). Aquatic physical therapy helped some. (Tr. 65).

Relevant Medical Evidence

*Prior to Alleged Onset Date*

In 2012, prior to Plaintiff's alleged onset date, she saw Mahmoud S. Mohamed, M.D., at the Comprehensive Neurology & Headache Center monthly. *See* Tr. 780-89. He noted some tenderness and reduced range of motion in Plaintiff's back, neck, and shoulders, and assessed, *inter alia*, fibromyalgia. *See id.* In June, Dr. Mohamed noted Plaintiff had "severe fibromyalgia" and "excessive daytime sleepiness". (Tr. 783). In August, he noted she had "a lot of aches, pain and fatigue" and had "a great deal of pain, especially with any ADLs." (Tr. 781). In September, he noted Plaintiff had a "full blown case of fibromyalgia" and difficulty with lifting, bending,

and carrying. (Tr. 780). A Toledo Chiropractic evaluation from January 2012 noted mild cervical spondylosis at C4-5 and C5-6, and mild osteoarthritis at L5. (Tr. 347).

*After Alleged Onset Date*

In September 2012, Plaintiff went to the hospital reporting a migraine with photosensitivity and nausea. (Tr. 639-44). The doctors prescribed medications and discharged her. (Tr. 645).

In October, Dr. Mohamed noted Plaintiff had "significant fibromyalgia" which caused "difficultness with activities of daily living, anything that requires bending, lifting or carrying." (Tr. 779). He refilled Plaintiff's Percocet and Opana ER prescriptions, and added Topamax. *Id.*

In November 2012, Plaintiff went to the University of Toledo Medical Center reporting neck pain radiating down her right arm, as well as numbness and tingling in her lower extremities into her feet and upper extremities into her hands. (Tr. 564-65). On examination, she had full muscle strength, but some limitations in lateral bending and lumbar pain. (Tr. 561-62). The physician assessed chronic neck and lower back pain with radiation. (Tr. 562). She was referred to a pain management physician for evaluation and to discuss the possibility of a spinal cord stimulator. *Id.* She was also referred for aquatic therapy. (Tr. 562, 565).

Two days later, Plaintiff returned to Dr. Mohamed reporting her fibromyalgia was worse, and difficulties with bending, lifting, and carrying. (Tr. 778). On examination, Dr. Mohamed found neck and shoulder tenderness with decreased range of motion. *Id.* Plaintiff had no weakness, but reported her right arm felt "heavy". *Id.* Dr. Mohamed gave trigger point injections and assessed fibromyalgia, migraines, and neck pain with cervical radiculopathy. *Id.* He prescribed medication and discussed stretching and low impact exercise. *Id.*

In December 2012, Dr. Mohamed again assessed fibromyalgia and found tenderness in Plaintiff's neck and shoulders on examination. (Tr. 777). She was given refills of Percocet and Opana ER. *Id.* An MRI of Plaintiff's cervical spine performed that same month was normal. (Tr. 675-76).

Later that month, Plaintiff saw Kevin Bodkin, D.O., for chronic thoracic back pain. (Tr. 459). Dr. Bodkin noted decreased range of motion, tenderness, swelling, pain, and spasm in Plaintiff's thoracic back. (Tr. 460). He assessed a trapezius muscle spasm and prescribed Valium. (Tr. 461). Plaintiff went to the emergency room two days later for lower back and neck pain. (Tr. 633-35). On examination, she had a full range of motion in her lower back and cervical spine. (Tr. 635).

Plaintiff returned to Dr. Mohamed in February 2013 for medication refills. (Tr. 775). He noted Plaintiff's continued fibromyalgia, which she said was aggravated by the colder weather, and helped by trigger point injections. (Tr. 775). Dr. Mohamed refilled Opana ER and Percocet, and discussed stretching and low impact exercise. *Id.*

That same month, Plaintiff saw Dr. Bodkin. (Tr. 467-69). He noted Plaintiff had chronic back pain in her thoracic spine, with stiffness all day. (Tr. 467). On examination, Dr. Bodkin noted decreased range of motion, tenderness, pain, and spasm in her thoracic and cervical spine. (Tr. 468). Dr. Bodkin assessed anxiety and thoracic back pain, and prescribed Valium. (Tr. 469). He noted Plaintiff declined a physical therapy referral, but had good results from osteopathic manipulation. (Tr. 469).

In March 2013, Plaintiff saw Dr. Bodkin for chronic neck pain. (Tr. 478). He assessed cervical paraspinal muscle spasm and myofascial pain syndrome. (Tr. 479). Dr. Bodkin referred Plaintiff to physical therapy, and noted he wanted to wean her off narcotic pain medication and

"deal with her pain through PT". *Id.* He also questioned whether a Botox injection might "break" the spasm. *Id.*

The same month, Dr. Mohamed noted Plaintiff complained of neck pain and stiffness, as well as burning pain. (Tr. 774). She again reported worsening symptoms with colder weather and Dr. Mohamed found tenderness in Plaintiff's neck and shoulder with decreased range of motion. (Tr. 774). Plaintiff underwent trigger point injections in her cervical paraspinal muscles and shoulder. *Id.* Dr. Mohamed refilled her medications, and continued to recommend stretching and low impact exercises. (Tr. 774).

Also in March 2013, Plaintiff sought treatment for cervical and lumbar pain with Amar Goyal at the Ohio Pain Center. (Tr. 700). On examination, Dr. Goyal noted "severe facet column tenderness [bilaterally] exacerbated by extension", limited back range of motion, but full upper and lower motor strength. (Tr. 701). Dr. Goyal noted Plaintiff would "discuss with [D]r. [M]ohammed [sic] if he will continue opioids." (Tr. 702).

Later that month, Dr. Bodkin noted he would refer Plaintiff to physical therapy and had a "long discussion" with her about weaning off Opana. (Tr. 489).

At an April 2013 visit with Dr. Mohamed, Plaintiff reported a fibromyalgia flare up, with neck pain and stiffness, and lower back pain. (Tr. 773). She again had tenderness and a decreased range of motion and "[m]ild generalized weakness" due to pain. *Id.* Dr. Mohamed noted he "had a long discussion with her about the use of Opana" and wanted Plaintiff "to take less." (Tr. 773). He reduced Plaintiff's Opana ER dosage, prescribed Percocet for breakthrough pain, and referred her to a pain specialist. *Id.*

Later that month, Plaintiff had two hospital visits for headache symptoms secondary to narcotic pain medication withdrawal. (Tr. 382-83, 628-30). She was then admitted to Arrowhead

Behavioral Health for opiate detoxification. *See* Tr. 406-07. She was discharged with a plan for a Suboxone treatment program. (Tr. 407).

At the end of April, Plaintiff saw neurologist Vicki Ramsey-Williams, M.D., for fibromyalgia. (Tr. 551-52). Plaintiff reported diffuse muscle pain and weakness. (Tr. 551). On examination, she had full muscle strength. *Id.* Dr. Ramsey-Williams noted Plaintiff likely had hyperalgesia related to her chronic use of narcotics. *Id.* She noted Plaintiff was "currently improving" after weaning from narcotic medications. *Id.* She agreed with the recommendation for water therapy, and suggested a trial of Gabapentin. *Id.*

In May 2013, Dr. Mohamed noted Plaintiff had continued tenderness in her neck, shoulders, and lower back. (Tr. 772). She stopped taking both Opana ER and Percocet. *Id.* Plaintiff "did not want to see a pain specialist", but had been attending aquatic physical therapy. (Tr. 772). Dr. Mohamed prescribed "only 60 of Vicodin as needed for the sever[e] pain." *Id.* The following month, Dr. Mohamed noted Plaintiff still had fibromyalgia symptoms, but was completely off narcotic pain medications. (Tr. 771). He prescribed Motrin and Flexeril, and "encouraged her to stay active and do exercise, especially swimming". *Id.*

Plaintiff also underwent a physical therapy evaluation in May 2013. (Tr. 587-91). Plaintiff cancelled an aquatic treatment visit on May 17 (Tr. 592), and attended a therapy session on May 20 (Tr. 593). She then cancelled an aquatic treatment visit on May 29 (Tr. 594), and was discharged on June 19 because she had cancelled appointments and had not called to reschedule (Tr. 595).

In June 2013, Dr. Bodkin found Plaintiff had decreased range of motion, tenderness, pain, and spasm in her cervical spine. (Tr. 520). He ordered x-rays. *Id.* He later that month assessed myofascial pain syndrome, and prescribed Tramadol. (Tr. 531). In July, Dr. Bodkin noted

increased muscular tension of the trapezius muscle, assessed myofascial pain syndrome and prescribed Norco. (Tr. 539-40). Dr. Bodkin noted similar findings in August. (Tr. 532-33).

August 2013 x-rays of Plaintiff's lumbar and cervical spine were unremarkable. (Tr. 566-69). A September 2013 MRI showed no disc herniation or central canal stenosis. (Tr. 673).

Plaintiff underwent an initial physical therapy evaluation in September 2013 for fibromyalgia, but was "seen only 1 visit for evaluation" and was discharged because she did not return. *See* Tr. 581 ("Patient has been non-compliant with therapy.").

In November 2013, Plaintiff saw Rashid Khalil, M.D., at Mercy Pain Management for an initial consultation. (Tr. 664). She was prescribed Gabapentin. *Id.* Her medication list included: Tramadol, Gabapentin, Norco, Lioresal, Imitrex, Theragran. (Tr. 664-65).

Plaintiff returned to the Ohio Pain Center and saw Dr. Goyal in December 2013. (Tr. 694). She received steroid injections in her cervical spine. (Tr. 694-96).

*Opinion Evidence*

In April 2014, state agency physician Leon Hughes, M.D., reviewed Plaintiff's file and opined that Plaintiff could perform the requirements of sedentary work with occasional overhead reaching. (Tr. 117-18). Dr. Hughes noted this was an adoption of the prior ALJ's RFC determination. *Id.* In July 2014, state agency physician Eli Perencevich, D.O., affirmed Dr. Hughes's opinion. (Tr. 127).

In August 2015—after Plaintiff's date last insured—Dr. Goyal completed a pain questionnaire. (Tr. 886-88). He noted Plaintiff had cervical spondylosis without myelopathy, severe facet tenderness with extension, and headaches. (Tr. 886). He noted her pain complaints were "appropriate for [her] condition" and that her pain responded favorably to treatment modalities other than pain medication. (Tr. 886-87). He noted she was likely to improve over the

next twelve months, and thought chronic pain treatment would help with restoration of activities of daily living. (Tr. 887-88).

VE Testimony

The ALJ asked the VE to consider an individual of Plaintiff's age, education, work experience, and residual functional capacity as ultimately determined by the ALJ. (Tr. 81). The VE responded such an individual could perform jobs such as addresser, sorter, or final assembler. (Tr. 81-82).

ALJ Decision

In her written decision, the ALJ found Plaintiff met the insured status of the Social Security Act through December 31, 2013 (Tr. 17), and had not engaged in substantial gainful activity from her alleged onset date through that date (Tr. 18). She had severe impairments of cervical and lumbar spine degenerative disc and joint disease, fibromyalgia, and migraine headaches. *Id.* None of these impairments, individually or in combination, met or medically equaled the severity of a listed impairment. (Tr. 20). The ALJ then found Plaintiff retained the residual functional capacity

> to perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a), except: allowance to change positions every 30 minutes for one to two minutes in the immediate vicinity of the work station; occasional climbing stairs, kneeling, crouching and crawling; no climbing ladders and the like; no overhead reaching; no exposure to obvious hazards; and simple work that is not fast paced, meaning no work where the pace of productivity is dictated by an external source over which the claimant has no control such as an assembly line or conveyor belt.

(Tr. 21). Based on the testimony from the VE, the ALJ found Plaintiff could not perform any past relevant work (Tr. 30), but could perform other jobs existing in significant numbers in the national economy (Tr. 31). Therefore, the ALJ concluded, Plaintiff was not disabled from

September 12, 2012 (her alleged onset date) through December 31, 2013 (her date last insured). (Tr. 32).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff asserts the ALJ erred in evaluating her subjective fibromyalgia symptoms. Specifically, she contends the ALJ violated SSR 12-2p in discounting Plaintiff's fibromyalgia based on a lack of objective findings, erred in her credibility analysis, and failed to assess the side effects of Plaintiff's medications. Plaintiff also asserts the ALJ erred at Step Five in relying on the VE's testimony. The Commissioner responds that the ALJ's decision is supported by substantial evidence and should be affirmed. For the reasons discussed below, the undersigned affirms the decision of the Commissioner.

<u>Fibromyalgia</u>

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers v. Commissioner,* 486 F.3d 234, 244 n.3 (6th Cir. 2007) (quoting Stedman's Medical Dictionary for Health Professionals and Nursing, 542 (5th ed. 2005)); *see also* SSR 12–2p, 2012 WL 3104869, at *2 (fibromyalgia is a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months"). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). "[P]hysical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion." *Preston*, 854 F.3d at 818.

This makes the credibility determination particularly relevant where a claimant has been diagnosed with fibromyalgia. "Opinions that focus solely upon objective evidence are not particularly relevant" due to "the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia." *Rogers*, 486 F.3d at 245. Cases involving fibromyalgia "place[ ] a premium . . . on the assessment of the claimant's credibility." *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003). This is so because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486 F.3d at 243.

Social Security Ruling 12–2, Evaluation of Fibromyalgia, "provides guidance on how we develop evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how we evaluate fibromyalgia in disability claims. . . ." SSR 12–2p, 2012 WL 3104869, at *1. The Ruling also states that fibromyalgia should be analyzed under the traditional five-step evaluation process used for analyzing other claims for disability. *Id.* at *5–6.

The Sixth Circuit has recognized that pain alone may be disabling. *See King v. Heckler*, 742 F.2d 968, 972 (6th Cir. 1984). However, an ALJ is not required to accept a claimant's subjective report of symptoms, rather she must make a credibility determination. In making this determination and considering whether a claimant has disabling pain, an ALJ must consider: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; and 6) any other measures used to relieve pain. 20 C.F.R. § 404.1529(c)(3); *see also* SSR 96-7p, 1996 WL 374186.[2] "Nonetheless, a diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008). "Some people may have a severe case of fibromyalgia as to be totally disabled form working but most do not, and the question is whether claimant is one of the minority." *Id.* at 806; *see also Stankoski v. Astrue*, 532 F. App'x 614, 619 (6th Cir. 2013) ("But a diagnosis of fibromyalgia does not equate to a finding of disability or an entitlement to benefits."). And ultimately, it is for the ALJ, not the reviewing court, to judge the credibility of a claimant's statements. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony,

2. An ALJ is not required to discuss every factor, or conduct a factor-by-factor analysis. *See Storey v. Comm'r*, 1999 WL 282700, at *3 (6th Cir. 1999)

and other evidence." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). The ALJ's credibility determination "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers*, 486 F.3d 234, 248.

The ALJ here recognized Plaintiff's fibromyalgia, and in fact found it to be a severe impairment. (Tr. 18). Further, the ALJ explicitly addressed SSR 12-2p in her analysis of the listed impairments. (Tr. 21). The ALJ also recognized that Plaintiff had limitations flowing from her fibromyalgia pain and discussed them in her analysis of the evidence. *See, e.g.,* Tr. 24 ("medical records through September 2012 document continued reports of limitations in function secondary to fibromyalgia pain that would have limited her to a sedentary exertional level"); Tr. 28 ("the claimant would have required an allowance to change positions every 30 minutes for one to two minutes in the immediate vicinity of the workstation due to residual symptoms of back pain and muscle stiffness."). The ALJ recognized and cited Plaintiff's ongoing symptoms of pain and tenderness in her neck, shoulders, and back. *See* Tr. 24 ("continued reports of tenderness and heaviness over the shoulders and cervical spine"; "symptoms of lower back pain, neck pain, and fibromyalgia symptoms"; "symptoms of neck pain and tightness in the shoulders"; "diffuse tenderness and a decrease range of motion in the mid-back region") (citing Tr. 778, 349-50, 777, 460); Tr. 25 ("some evidence of tenderness and stiffness in the neck and shoulders"; "an examination of the claimant's lower back and cervical spine revealed only mild to moderate symptoms of subjective tenderness and associated decreases in range of motion") (citing Tr. 775, 468-69); Tr. 26 ("the claimant continued to present with some symptoms of muscle tenderness and a decreased range of motion in the neck consistent with myofascial pain syndrome"; ""some tenderness in the paraspinal muscles") (citing Tr. 479, 377); Tr. 27

("continued to report residual symptoms of lower back and neck pain secondary to fibromyalgia and myofascial pain syndrome"; "found to have some positive signs and symptoms of neck pain, stiffness, and lower back myalgias"; "continued complaints of residual muscle pain and stiffness over the lower back and neck region"; "chronic symptoms of neck and shoulder pains") (citing Tr. 771-72, 519, 530-43, 673).

The ALJ also considered Plaintiff's treatment for fibromyalgia, consisting of pain medications, trigger point injections, and some physical therapy. *See* Tr. 23-29. She noted Plaintiff's use of narcotic medications, *see* Tr. 23-26, and her physicians' later (successful) attempts to wean her off them, *see* Tr. 26. The ALJ also specifically noted that Plaintiff once declined a physical therapy referral (Tr. 25), and twice started physical therapy, but did not complete the recommended treatment in both June and September 2013 (Tr. 27). *See* Tr. 469 ("Offered PT but patient decline at this time."); Tr. 581 (discharge summary noting Plaintiff "did not meet goals secondary to seen only 1 visit for evaluation and did not complete [plan of care]"); Tr. 595 ("[Patient] cancelled remaining appt's and has not called to reschedule. No significant process [due to] limited attendance."). Treatment is a relevant factor to assessing credibility. *See* 20 C.F.R. § 404.1529(c)(iv)-(vi). And the failure to follow prescribed treatment may also be used to discount credibility regarding disabling symptoms. *See Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988).

Moreover, the ALJ also assigned "great weight" to the state agency reviewing physicians because she found those opinions "are generally consistent with medical records from the claimant's various medical providers, which show [Plaintiff] would be limited to sedentary work activity secondary to fibromyalgia symptoms, migraine headaches, and chronic lower back and neck pain." (Tr. 29). These physicians had significant evidence of Plaintiff's fibromyalgia and

associated symptoms and opined Plaintiff remained capable of a range of sedentary work. See Tr. 117-18, 127.[3]

After this thorough review of the medical evidenced, the ALJ explained that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (Tr. 30). The ALJ then went on to state that "[w]hile it is clear the claimant perceives herself to be in a great deal of pain most of the time, there is simply no objective medical evidence to support a finding that the claimant is completely disabled." *Id.* Plaintiff is correct that an ALJ may not rely *solely* on the lack of objective medical evidence to discount a diagnosis of fibromyalgia, but a reading of the ALJ's decision in its entirety illustrates that the ALJ did not do so. Rather, she accepted the diagnosis of fibromyalgia and found limitations therefrom. In fact, she limited Plaintiff to less than a full range of sedentary work, in large part because of her ongoing fibromyalgia pain. *See* Tr. 24 (noting that prior to Plaintiff's alleged onset date, she had "limitations in function secondary to fibromyalgia pain that would have likely limited her to a sedentary exertional level"); Tr. 28 (noting the RFC required an allowance for Plaintiff to change positions "due to residual symptoms of back pain and muscle stiffness"); Tr. 29 (noting the "medical records from the claimant's various medical providers . . . show [Plaintiff] would be limited to sedentary work

---

3. In Reply, Plaintiff asserts the ALJ should not have relied on opinions based on an incomplete medical record. However, an ALJ may rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating her opinion. *See, e.g., McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence that was developed post-dating those opinions); *Patterson v. Comm'r of Soc. Sec.*, 2017 WL 914272 at *10 (N.D. Ohio) ("ALJ may rely on a state agency reviewer who did not review the entire record, so ... long as the ALJ also considers the evidence post-dating the opinion."); *Ruby v. Colvin*, 2015 WL 1000672, at *4 (S.D. Ohio) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."). A review of the ALJ's decision here shows that she did so. *See* Tr. 23-30.

activity secondary to fibromyalgia symptoms, migraine headaches, and chronic lower back and neck pain."). The ALJ considered Plaintiff's daily activities (*see* Tr. 18), medications, and other treatments. *See* 20 C.F.R. § 404.1529(c). This is sufficient.

To the extent Plaintiff would argue that a mere diagnosis of fibromyalgia inherently corroborates the severity of her pain, such an argument is untenable. The Sixth Circuit has noted, "'a *diagnosis* of fibromyalgia does not automatically entitle [the claimant] to disability benefits.'" *Torres v. Comm'r of Soc. Sec.*, 490 F. App'x 748, 754 (6th Cir. 2012) (emphasis in original) (*quoting Vance*, 260 F. App'x at 806). Here, Plaintiff points to no evidence regarding the severity of her fibromyalgia or any additional functional limitations that stem from her fibromyalgia, beyond her own statements. And, as the ALJ found, the record as a whole did not fully support Plaintiff's claimed limitations. It is Plaintiff's burden to provide evidence sufficient to establish disability. *See* 20 C.F.R. § 404.1512(a). Notably, there is no medical opinion evidence in the record to support limitations beyond those in the RFC. *See Torres*, 490 F. App'x at 755 (finding ALJ's statement that the claimant's "subjective allegations are not entirely supported by the totality of the medical evidence" sufficient where the allegations were inconsistent with daily activities, and medial opinion evidence).

*Side Effects*

In conjunction with her fibromyalgia/credibility argument, Plaintiff contends the ALJ erred in not addressing medication side effects. She argues that "the failure to discuss, weigh in on how the complaints of tiredness, sleepiness, need for napping, etc. are supported or not by the

record is fatal error." (Doc. 15, at 21).[4] Plaintiff is correct that side effects are one factor to be considered in assessing credibility. *See* 20 C.F.R. § 404.1529(c)(3)(iv).

Plaintiff contends "the record is replete with Plaintiff's statements and testimony at the hearing regarding intractable pain." (Doc. 15, at 15) (citing Tr. 275, 281, 286, 288, 290, 291, 299). The records Plaintiff cites consist solely of her Disability Reports in which she reports pain, and cites fatigue as a medication side effect. *See* Tr. 275, 281, 286, 288, 290, 291. She also cites her testimony about sleepiness as a result of medication. (Doc. 15, at 16) (citing Tr. 56). Plaintiff points only, however, to her subjective reports of these side effects. Although such side effects *could* have an impact on Plaintiff's RFC, the ALJ is required to make such a determination based on the record as a whole. 20 C.F.R § 404.1545(a)(3). The ALJ stated she did so here. *See* Tr. 30 ("In reaching this conclusion, the undersigned has taken into consideration the entirety of the medical record."). Plaintiff points to nothing in the record suggesting she complained of these side effects to her physicians. While the ALJ here did not explicitly discuss the effect of such side effects on the RFC, she did cite Plaintiff's testimony on this point (Tr. 22) ("the claimant indicated her pain was progressively worsening and her medications made her feel tired, drowsy, and lethargic"), and—after thoroughly summarizing the record evidence (Tr. 23-

---

4. Within her argument about credibility and medication side effects, Plaintiff implies that the ALJ erred in giving no weight to Dr. Goyal's pain questionnaire. *See* Doc. 15, at 18-19. The ALJ stated  she gave the opinion no weight because "his opinion falls outside the present period under consideration for disability benefits." (Tr. 29). Although Plaintiff is correct that evidence obtained after the date last insured may be considered if it relates back to the time period under consideration, nothing in Dr. Goyal's opinion suggests that his opinion relates to the time period at issue here—September 2012 through December 2013. His opinion was issued in August 2015, over eighteen months after Plaintiff's date last insured. It does not reference earlier time periods. Thus, the undersigned finds no error in the ALJ's decision to give this opinion no weight. *See Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004). ("Evidence of disability obtained after the expiration of insured status is generally of little probative value."); *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003) ("Post–expiration evidence must relate back to the claimant's condition prior to the expiration of her date last insured.").

30)—ultimately determined Plaintiff's subjective symptom reports overall to be unsupported by the record (Tr. 30) ("Therefore, the undersigned finds that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible"). Given that Plaintiff does not point to any additional evidence supporting her subjective report of medication side effects, the undersigned finds no error in the ALJ's failure to explicitly reject this testimony. *See Essary v. Comm'r of Soc. Sec.*, 114 F. App'x 662, 665 (6th Cir. 2004) ("Although Essary testified that she suffered from dizziness and drowsiness as a result of her medications, Essary's medical records make no indication that Essary reported such side effects to any of her physicians."); *Hopkins v. Comm'r of Soc. Sec.*, 96 F. App'x 393, 395 (6th Cir. 2004) (alleged medication side effects of drowsiness, nausea, and blurred vision "not documented in the record").[5]

Mental Limitations

Plaintiff also raises a brief argument regarding the mental limitations imposed by the ALJ. *See* Doc. 15, at 17-18. Plaintiff contends the ALJ erred because she found Plaintiff had no severe mental impairment, but limited Plaintiff to "simple work that is not fast paced" in the RFC. (Tr. 21). Plaintiff contends the "ALJ cannot have her cake and eat it too" and "[s]he must give a basis for such a limitation". (Doc. 15, at 17). However, Plaintiff testified that she had difficulty concentrating and understanding when reading and watching television. (Tr. 74-75). It is unclear, thus, how Plaintiff asserts the inclusion of this additional restriction in RFC was harmful error.

---

5. Because the ALJ is only required to include in the RFC those limitations she finds credible and supported, Plaintiff's argument that the ALJ erred in failing to include a limitation for napping in the hypothetical question (Doc. 15, at 22-23), is not well-taken. *See Casey v. Sec'y of Health & Human Servs*, 987 F.2d 1230, 1235 (6th Cir. 1993).

<u>Step Five / VE Testimony</u>

Finally, Plaintiff contends that the ALJ erred in relying on the VE's testimony because the Dictionary of Occupational Titles ("DOT") descriptions of the jobs identified by the VE conflict with the RFC. Specifically, Plaintiff correctly points out that the three jobs identified by the VE all require frequent reaching[6], while the RFC limited Plaintiff to no overhead reaching. The Commissioner responds that the ALJ properly relied on the VE testimony. The undersigned finds no error.

At Step Five, the ALJ must make a finding "supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (internal quotation and citation omitted). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on the VE's testimony in response to a hypothetical, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516–17 (6th Cir. 2010).

One of the most common tools utilized by VEs during testimony is the DOT, which is a list of "maximum requirements of occupations as generally performed"; however a VE "may be able to provide more specific information about jobs or occupations than the DOT." SSR 00–4p, 2000 WL 1898704, at *2. Indeed, a VE has the ability to craft her answer in response to an individualized hypothetical RFC with potential limitations unforeseen by the DOT. *See Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009) ("[An] ALJ may choose to rely on the VE's testimony in complex cases, given the VE's ability to tailor her finding to an

6. *See* DOT, 4th Ed. (Rev. 1991), 209.587-010 Addresser, 1991 WL 671797; 521.687-086 Nut Sorter, 1991 WL 674226; 713.687-018 Final Assembler, 1991 WL 679271.

'individual's particular residual functional capacity.'"). "[N]either the DOT nor [the expert's testimony] automatically trumps when there is a conflict." SSR 00–4p, 2000 WL 1898704, at *2.

Social Security Ruling 00–4p provides that an ALJ must elicit a reasonable explanation from a VE when there is an apparent conflict between the VE's testimony and the DOT:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an *apparent unresolved conflict* between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

2000 WL 1898704, at *2 (emphasis added).

The ALJ has an affirmative responsibility to "inquire, on the record, as to whether or not there is [ ] inconsistency" between the VE's testimony and the DOT." *Id.* Beyond this initial inquiry, however, the Sixth Circuit has held the ALJ is under no obligation to further investigate the accuracy of a VE's testimony "especially when the claimant fails to bring any conflict to the attention of the [ALJ]." *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008); *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009); *see also Beinlich*, 345 F. App'x at 168. "Absent an objection to the vocational expert's testimony, [an] ALJ reasonably relie[s] on the testimony." *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 468 (6th Cir. 2017) (citing *Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 269, 374 (6th Cir. 2006)) ("Nothing in SSR 00–4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct.").

Here, at the beginning of the VE's testimony, the VE agreed to advise the ALJ of any conflict between her testimony and the information in the DOT. (Tr. 79). Thus, the ALJ inquired, as required, and thereby satisfied her duty. *See* SSR 00-4p, 2000 WL 1898704, at *2. And, the

VE here specifically noted that she relied on her own experience in making a determination regarding overhead reaching. *See* Tr. 82 ("[The DOT] addresses reaching, but not overhead, so I relied on my experience to address that aspect as well."). Plaintiff's counsel did not point out the conflict now asserted.[7] As such, Plaintiff may not raise it now. *See, e.g., Staymate*, 681 F. App'x at 468. Therefore, the undersigned finds no error in the ALJ's reliance on the VE's testimony.[8]

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and affirms that decision.

   s/James R. Knepp II
United States Magistrate Judge

---

7. Plaintiff asserts that "[n]o ALJ will allow counsel to stop the hearing [to] look up jobs in the DOT/SCO; leaving VE's capable of shooting from the hip with regard to consistency testimony with DOT/SCO despite knowing to contrary." (Doc. 17, at 3). However, Plaintiff makes this assertion without any citation or evidentiary support. The Court cannot reverse based on assertions unsupported by any records. Notably, at the hearing, counsel did not ask the ALJ to stop and examine the DOT. The following exchange occurred immediately after the ALJ finished questioning the VE:

> ALJ: All right, [counsel], anything I've not already covered?

> ATTY: No. Did you do – you shot all the things I would have asked. You did a good job, Your Honor.

(Tr. 84).

8. As an aside, the undersigned also notes there is not necessarily a conflict between a job requiring frequent reaching, and a restriction to no overhead reaching. The "frequent reaching" required by a job could consist of non-overhead reaching. And the VE here testified—based on her experience—that an individual limited to Plaintiff's RFC (including no overhead reaching) could perform the jobs identified. This constitutes substantial evidence. *See* SSR 00–4p, 2000 WL 1898704, at *2 ("[N]either the DOT nor [the expert's testimony] automatically trumps when there is a conflict."); *Beinlich*, 345 F. App'x at 168 ("[An] ALJ may choose to rely on the VE's testimony in complex cases, given the VE's ability to tailor her finding to an 'individual's particular residual functional capacity.'").